Good morning, Your Honors. May it please the Court, my name is Nicholas Cady. I'm here representing the appellants Cascadia Wildlands, Oregon Wild and Umpqua Watersheds. And I want to take a brief second before I dive into the claims and just explain and kind of stress that appellants did not take lightly challenging a tribal timber sale. We attempted not to burden the tribe economically. We did have issues with the Rasler timber sale, that's we did not challenge that sale. That sale is producing 22 million board feet of lumber. That's enough to satisfy the tribe's timber targets for the next decade, for over the next decade. This latest sale is producing another 18 million board feet and this sale raised issues that we needed to have resolved. We're here today discussing that sale, it's the Coquille timber sale. It's a Bureau of Indian Affairs project on the Coquille Forest in Southern Oregon. These are lands managed in trust for the benefit of the Coquille Indian tribe. The sale involves the regeneration harvest of 268 acres of old growth, this is occupied by the Northern Spotted Owl, over 200 acres of commercial thinning and approximately three miles of road construction. Is that all within the same 268 acres? Or is it 268 acres plus 200 acres? Plus 200 acres. The 268 is exclusively regeneration harvest. I couldn't find in the record how many owls or owl couples are currently inhabiting the Coquille project area. I believe there are four separate owl sites and the Fish and Wildlife Service estimated that 14 spotted owls would be taken by the project. Because they have young juveniles in the nest site. Well, I know that the project expects to take 14 owls, but how many are in the whole area? I'm not sure, Your Honor, I'd have to look that up. I think they do modeling and predictive modeling to determine. They haven't surveyed the entire area. I'm just, it's just kind of hard to put it into context, what we're talking about when you're saying the taking of 14 owls of couples are in jeopardy. Right. As far as overall owls in the Coquille forest, I think they do actually predict that in the, I could look that up in the environmental assessment, but I don't have that information on hand. I didn't see it. So if you can. All right, I will take a look. So I was going to begin discussing the NEPA claims and then turn to the Coquille Restoration Act claims. The Bureau of Indian Affairs is a federal agency and when gauging in the NEPA process, it must conduct a cumulative effects analysis. And specifically here, that means disclosing to the public and analyzing the combined effects of other timber sales in the area that are approximate in time and location. The purpose being to not only inform the public in the court system, but also to determine whether or not the two projects combined will have potentially significant impacts, thus requiring the preparation of an environmental impact statement. Right. So just to set the stage, I want factually to understand the Adler-Rassler project was analyzed individually and approved. And so that's an existing project that is uncompleted, but it has been, it went through the whole process. Yes, Your Honor. Okay. And then as I understand the government's argument, they're saying, okay, we're now going to do an add-on, the 200 acres. And we looked at the existing Adler project and then we accumulated that with the new project. And we're taking, we're assuming all the impacts that were analyzed the first time around. And then we're seeing how much incremental impact has happened. So what's wrong with that? Right. I think you've accurately summarized the argument we're having in court today. The problem is that the environmental assessment says that they separate out the Rassler sales. So I think there's a little bit of confusion around this. So the Rassler sales began implementation in 2011. Some had yet to be completed. And so they considered into the baseline, I have a quote that I could read for you and it's not in front of me, but if I paraphrase, it says the no action alternative in the proposed action, assume the combined effects of all past actions. So these are the timber, the Rassler timber sales that have been implemented or were being logged at the time of when they were drawing up the Coquel EA. They clearly differentiate these four units, these four Rassler units that are in table eight of that EA. It's in the same paragraph. They go on to clearly say, these are the future sales. These have not been logged yet. We're going to analyze these in the cumulative effects discussion. That means they had not assumed that those four projects effects were, had taken place, or they say they had not assumed that they had taken place. I know they're in progress and they've been analyzed and they've been approved as previously as yes. Yes. And you're saying they aren't taking into account not only the completed, but the projected, the approved projected? Well, they say they're going to, I mean, our claim is based upon the fact that they just don't do that. They say they're going to do it in the cumulative effects analysis. They say they're going to add the effects from the Coquel timber sale to the Rassler timber sales and then determine significance, disclose that to the public. The problem is that they don't disclose any of that information or do any of that addition, any of that combination in the cumulative effects arguments or anywhere else. They don't repeat the Adler-Rassler analysis in the Coquel project. They don't need to repeat the analysis per se. They just need to disclose the effects of the Rassler sale. We're trying to determine the combined effect to this region. These two sales together. The effect of the Rassler, the Adler-Rassler sale is contained in the Adler-Rassler analysis, is it not? In the Rassler EA, yes, it is. So, by reference to it, can a member of the public find out what happened in Rassler and add it to what's happening in Coquel and understand what's happening? I mean, it's incorporation by reference, isn't it? Well, no, no. The Rassler EA is not incorporated by reference into the Coquel environmental assessment. Statutorily, the purpose of a NEPA cumulative effects analysis is to put all of this in front of the public in a clear manner. So, we do have two separate environmental assessment documents here. And I guess a member of the public could go back and parse through each of these documents separately and be like, oh, this is what's going to happen. But if you look at the Coquel EA on its own, I mean, the purpose of a cumulative effects analysis is that all this information is provided together in the cumulative effects sections. So, you're able to see... Not the full analysis, just the final effects. Yes. They talk about the final effect, but you think that's not sufficient to inform the public? They... I think they need to disclose and analyze the effects of the Rassler sale in conjunction with the Coquel sale in the Coquel EA. In the Coquel. Yes. So, how much do they have to put in and why is what they put in insufficient? That's a good question. I think that's relatively undecided, but courts in the Ninth Circuit have... I mean, there's no concrete standard, like they have to have this. Actually, a few courts have said they have to tally up road construction, they have to tally up acreages being logged, they have to show maps of locations. But here, it's a relatively easy question to resolve because they don't provide anything. Like, I would urge your honors to go back and read these cumulative effects sections. There is zero information provided about the sale. They're listed in one table in Table 8, and it provides the acreage to be clear cut, or regeneration harvested, I'm sorry. And so, that one table is all that's provided. And they say, oh, we're going to analyze these sales later in these resource-specific cumulative impact discussions, but they never end up getting to those parts in the EA. They either solely talk about the Coquel timber sale itself, or they make these totally perfunctory conclusory statements that don't add any substance to the EA whatsoever. So, you're referring to ER 59 and the cumulative effects section? Is that what you're talking about? Yeah, the cumulative effects analysis are found... they have one at the end of each resource-specific section. So, there will be a section on soils at the end that will have a cumulative effects. There will be a section on late successional species. There will be a cumulative effects. If you look at every one of those cumulative effects sections, they contain information, no detail, no analysis whatsoever of the Rasler sales. Basically, the public has no idea whether or not these sales have been factored into these equipment or not. That's kind of the primary problem. Let me ask you a question, because I think you refer or argue that this somehow is similar to the Klamath-Siskiyou case. Is that right? Yes. All right. But in that case, the agency decided to separate one large project into separate ones. Sure. Here, these timber sales were never part of one big project. Right. Does that distinguish that? I don't think so, Your Honor. When they separated out those four or five projects in the Klamath-Siskiyou case, they did separate a NEPA analysis for each of those cases, and they probably were implemented at different times. The decisions were reached on separate dates. I don't see how that differs from this situation at all. We have two separate NEPA analysis, fairly close together, two years apart. And so I don't see any difference between that case and the present circumstance. And I'm running a little short on time. I was wondering if I could turn to the Coquille restoration claims. Go ahead. I have a question, I think, on that. I mean, what's your best support for your position that standards and guidelines is not a term of art used in the forest plans? Right. So the term standard and guideline is fairly ubiquitous. It's used in every forest plan, every grazing plan, every resource management plan contains standards and guidelines. It's merely the enforceable provisions of a plan. I mean, it's defined as the rules and limits governing actions and principles specifying the environmental conditions or levels to be achieved and maintained. The Coos Bay RMP, we're talking about this recovery plan compliance standard that falls within these objectives and management action sections within the Coos Bay Resource Management Plan. The Coos Bay Resource Management Plan defines the objectives and management action section as the direction and limits that govern actions and also provide the principles that specify the environmental conditions or levels to be achieved and maintained. It's exactly the same. The standards and guidelines within the direction sections. Does that answer your question? I guess so. I may ask you, should we or are we required to defer to the tribe on how it interprets the standards and guidelines? No, Your Honor. So I think the question of deference comes when the agency, it would be the Bureau of Indian Affairs, but the question of deference comes when the agency makes a mitigation argument. In the Coquille Forest Resource Management Plan, it clearly states that the Bureau of Indian Affairs and management of the Coquille Forest is subject to the Coos Bay Resource Management Plan. The Coquille EA likewise says it complies with the Coos Bay Resource Management Plan. So there's no agency determination that they don't have to comply with the, that's where deference would fall in if they were like, oh, we get to comply with our own forest plan, not the Coos Bay Resource Management Plan. Maybe they would get deference on that point, but they concede in all the documents. That's not their understanding of how the statute works. I mean, if Congress had wanted to require the secretary to comply with the forest plan objectives, couldn't it have just said that? Well, the objectives are in the forest plan. So by saying to comply with the forest plan, he's saying they have to comply with the objectives therein. So I want to be clear. In the Coos Bay RMP, it has broad visions and goal statements that are pretty ubiquitous. It would be hard to comply with these. You couldn't bring a claim being like, oh, we want to enforce this claim of late The management action sections are very specific. So it's specific to special status species or soils or water quality. And the objective is recovery plan compliance. It's pretty straightforward. And the management action, the corresponding management action is consultation with Fish and Wildlife Service. You must modify or abandon your project in order to comply with the Endangered Species Recovery Plan. It's not kind of a morph. It's a pretty straightforward standard, I feel like. All right. Do you want to save a minute for? I would. I would love to. Thank you. Good morning. My name is Ellen Durkee. I represent the Bureau of Indian Affairs. And I'm going to try to give at least five minutes for Mr. Goodman, who's the counsel for the Coquille Tribe. On the cumulative effects issue, I just want to put it into context first and then address sort of one brief issue, because I do want to make sure that the tribe who is the manager of this property and has all of it at stake here has time to talk today. The NEPA regulations define accumulative impact as the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. So the idea here is to put the incremental action into the context, past, present, and reasonably foreseeable. And again, it's not to be formalistic about his past... Is it enough just to say that it considered other timber harvest cells in the area and that's it? Because there's really not a lot here. I mean, as Mr. Cady pointed out, this is very bare. And it seems like, you know, I know we have to defer to the agency on choice of methodology, but our case law, I think, does require that there has to be some, you know, reference to the reason it chose for that methodology or some other reason. You know, some statements maybe perhaps than what's beyond what's here. Well, Your Honor, I think there is enough here, and let me tell you why. First of all, this is not like some of the past action cases where the other projects were not even identified. In this case, the last 40 Adler sales projects were identified. In addition, I think they're being very selective in when they're reading the EA, because earlier in the EA, then the part that they want to focus on on page 49, the EA at, I think it's page 33 of the excerpts of record, explains that the no action alternative, like if we did not have the Coquel project, it includes the past management actions that have been taken. It says there that it's taken into account previously approved projects. Now, this is a very reasonable approach, and one that, as we've shown from the record, was in fact followed, because the, you know, the habitat issue, which is central here, takes into account the removal of the habitat from the previously approved project. This is kind of approach where you build into the aggregate, and it's pointed on what reasonably foreseeable actions that may not involve an already approved federal action add on, and that becomes the aggregate, is what is always followed in the ESA consultation context. And so it seems eminently reasonable here, since that was sort of the key issue here, that you always put into the baseline previously approved federal actions and ones that have already had consultation on them. It then gives you a realistic sense of where you're starting from. But, I mean, cumulative impact seems like it would mean cumulative impact, not just state the other projects. And here, it just doesn't seem the EA provided any data or conclusions, you know, to support the cumulative impact statement. The, first of all, in terms of, what they're asking for is to repeat the data that's already in the Adler Lost 40 EA. And the CoQEL EA did identify that as the decision document, so it is not difficult for the public then to pick up that EA and read it. And, in fact, these plaintiffs absolutely knew about that one, because they had participated by commenting on that one. So it's not as if they didn't know what the, you know, the quantification of that project involved. Secondly, I think that every NEPA document, and this one included, there are qualitative assessments, but there are also quantitative assessments throughout this EA. There are numbers about how much, you know, different types of, say, nesting, roosting, or foraging habitat there exists on a landscape level, that exists on a more localized level. It explains how much has been, you know, and those numbers take into account the previous projects, and so they're starting from that baseline, how much this removes. It also, there are tables in the EA that provide quantitative data about particular home ranges. There are, there's quantitative information about, you know, not only just road mileage, as they say, but also the relevance of roads in this, is the impact on other resources, not roads per se. But does the EA explain why aggregating the Adler-Rassler project was appropriate here, or explain the results of the aggregation? Well, it explains what they did. And then, I don't think, I mean, an EA is not a legal document to say, well, this is why, under the law, this is why. We follow a certain methodology, and then we come into court, and we say, well, does that fit, and so on and so forth. But these are not lawyers writing EAs. These are technical, you know, experts on these topics. And I think that this court's recent jurisprudence, you know, in lands council, and those two, I think, and then also even looking at the CEQ guidance, which came out within a year after the Powell decision, which talked about how you have to put in data. First of all, the jurisprudence says courts are not to tell agencies what processes they have to follow underneath them. Secondly, if you look at the CEQ guidance, it reinforces that position that there are not formalistic rules about when you have to, you know, identify particular projects, and so on. The idea is that you have to have a process, and the idea is that it is context-specific, and that your goal, as it's pointed out in the guidance, in the end is what you want is an aggregate of this project, past and present, and reasonably foreseeable together. It's not really that important to parse it all out into separate quantities, because the exercise is to aggregate it. I understand they're arguing, however, that there's no explanation how it got aggregated. I think it was whether and how they aggregated with the prior project. Well, I would submit that there is enough explanation to understand that, you know, in the EA, it's also in the biological opinion, but, I mean, that the Fish and Wildlife Service, you know, reinforces that, that they were putting existing projects together, and that they were putting those projects into the baseline. So I think that the EA signals that. Now, they question, you know, under the sort of basic principles we have here, as long as the agency's action can be reasonably discerned, then it is sufficient explanation, and the record does show that that is, in fact, what they did. But there's no summing up that says, okay, we took it into account, we're now taking the AR as an aggregate, and we're taking the Adler project and the extra 200 acres, we're now showing how we, you know, we aggregated them, and this is how we justify approval of the new project. Not in the words you just described, but on page 49 of the excerpts of record in the EA, it does say expressly that these 40 Rassler Sales Project Regeneration Harvest Units are taken into account in the cumulative effects analysis on the various resources. So, you know, it says expressly, now did it break it down and say this is what we did, and here's how we added this, and so on and so forth? No, but this is an EA, and, you know, it is not, you know, that is not a requirement. There are not these hard and fast rules. You can discern from the record what they did, it was reasonable what they did, and that, I submit, is enough. I am already down to almost five minutes, so I would like to just say a couple of, two quick points about the Restoration Act claim. First of all, you know, the word standards and guidelines in the Act has to be understood in the context of what the standard and guidelines mean in forest planning, and in every, you know, there's all sorts of ways, from case law to the way that plans are constructed, that objectives are not the same as standard and guidelines. Standards and guidelines is a term of art. You know, I'll just give one example, it's on page 46 of our brief, in terms of citations, but the Forest Service regulations, which don't, you know, apply here directly, but they have always, for 30-some years, said that if a forest was to be restored, it would have to be restored in accordance with the standards and guidelines of the Act. So, the forest plan has these components. It has objectives as a section, it has standards as a section, it has guidelines as a section. These are understood in this parlance to be different sections, and I think that's enough to, it's a fairly simple issue. Objectives are not standards and guidelines with meaning in that statute. The other thing I'd just like to point out, in the reply brief on page 26 of Cascadia Wildlands, says that there are two cases that do stand for the proposition that objectives are standards and guidelines. The first one they cite is League of Wilderness Defenders, and they cited, too, actually, the dissenting opinion in that. The panel majority opinion is very strong in our favor on that, as is the ALEC case. The other case is an unpublished district court opinion that's talking about the Aquatic Conservation Act. It's a conservation strategy, and that was never an issue here in terms of compliance, but that particular point about those objectives is that the Northwest Forest Plan requires findings to be made that those objectives are met. And I'll stop there. Ed Goodman May it please the Court, my name is Ed Goodman. I'm the attorney for the Cocoa Indian Tribe. I'm here with a number of members of the tribe who have traveled from southern Oregon, because this case is not simply about an abstract interpretation of the statute. It concerns the restoration of a small part of the tribe's ancestral homelands that they had been deprived and dispossessed of for over 150 years. And what we're talking about here in this case is the tribe's managerial discretion on those lands. I did want to just take a quick moment to address the questions about cumulative effects, and in particular the northern spotted owl habitat issue. And I think we can walk very clearly through the EA to see how those cumulative effects are disclosed. As Ms. Durkee pointed out, at ER 49, the EA specifically states that it's going to include in the cumulative impacts discussion and analysis past, present, and reasonably foreseeable future sales. It then refers to table eight on the following page, which are the Rassler sales themselves. And I think the key to this analysis, the cumulative effects analysis is found at table 12 at ER 62. And that table shows the impacts to northern spotted owl habitat from the middle floor Coquille sale. But the assumptions built into the existing habitat are that the Rassler sales have been completely harvested. So the existing habitat percentages and acreages are assumed to be those that would exist post-Rassler, not pre-Rassler. So what's represented on table 12 is the incremental additional impact from the middle floor Coquille sales on the habitat that is remaining after the Rassler sales. And we submit that that meets the 1508.7 cumulative effects requirement. Turning back to the Restoration Act statute and the term standards and guidelines. This is a remedial statute. It was enacted for the benefit of an Indian tribe to remedy what the chief sponsor called historic injustice. And it had three purposes, to restore the tribe's cultural and identity connections to their ancestral lands and the resources on those lands, to provide for the tribe's self-determination in the management of those lands, and to provide, and not least, for economic self-sufficiency to generate enough revenue so that the tribe could fund critical governmental programs, including programs like restoration of the Coquille culture, child welfare, education, health care, et cetera. These remedial purposes would be undermined by the appellant's interpretation of the standards and guidelines language. That section of the statute, 715CD5, is intended to ensure that the tribe has the same or aligns its managerial discretion and flexibility with that of the other agencies on adjacent federal lands. So they are required under that language to comply with federal law, to comply with designated habitat, and to comply with standards and guidelines of adjacent forest plans. But they still retain, the tribe retains the flexibility for recovery, whether or not to exercise its discretion to comply with discretionary recovery plan and to comply with discretionary biological opinion recommendations. The appellant's interpretation of the statute would deprive the tribe of its managerial flexibility over those lands, and it would deprive them of the economic self-sufficiency from those lands, guaranteed to come from those lands, because the prescriptions that they would have the tribe impose on those lands would essentially be only commercial thinning. And commercial thinning of a forest of this size would simply not be commercially viable. And if the tribe's not allowed to do regeneration harvests on this small acreage, they simply won't be able to use the forest for the purpose it's intended. Thank you, Your Honor. You've got about a minute, Mr. Kelly. Thank you. Your Honor, I just want to read two quotes concerning cumulative impacts and why you cannot just analyze these sales in isolation. The first is from Klamath-Siskiyou Wildland Center. Cumulative impacts of multiple projects can be significant in different ways. The most obvious way is the greater total magnitude of the environmental effects may demonstrate by itself that the environmental impact will be significant. Sometimes the total impact from a set of actions may be greater than the sum of the parts. But that's not talking about a pre-approved plan that's already stamped. That's talking about plans that are all being in development, correct? No, no, that could be referencing, it's just referencing multiple projects. Each project's going to be developed under a separate environmental assessment. They were not talking in that universe of the case. There was no pre-approved already stamped plan. They were talking about a number of individualized plans that were all in proposal stage, right? Right, yes, yes. So you're not extrapolating from that a rule that would say that applies to, or maybe you are, that you can't use a pre-approved plan and then incorporate it the way it's been done here. I would disagree. I don't think you are able to incorporate future sales. We get a lot into this, into the briefing, you can't incorporate future sales into a baseline. Okay. However, they just didn't even do that here. They differentiated out these four RASLR sales and they treated them as future sales. If one last second, if I could say one thing to the Coquille Restoration Act claim. So to put this briefly in context, the Coquille Forest was carved out of public lands that were part of the Northwest Forest Plan. The Coquille Forest was created a year after the Northwest Forest Plan was finished. And the Northwest Forest Plan was a landscape-wide approach to management for the recovery of the spotted owl. The whole analysis was based upon these Coquille Forest lands being managed the same as the Coos Bay BLM lands. If you were to pull 5,000 acres out of that management regime, it would undermine the analysis and the NEPA work that went into the Northwest Forest Plan. It would also undermine any project that was developed anywhere nearby the Coos Bay BLM. All those analyses are going to assume that these Coquille Forest lands are being managed the same as the Coos Bay BLM. It's not something lesser than. It can't be. That can't be Congress's intent. And that's all, Your Honor. Thank you. All right. Thank you very much, Counsel. And that concludes the case of Cascadia Wildlands v. Bureau of Indian Affairs as submitted. And that concludes our session for today. And we stand adjourned. Thank you all for your good arguments, by the way.
judges: Fisher, Bea, Murguia